# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Construction Systems, Inc.,

                              Plaintiff,

                                             Civ. No. 09-3697 (RHK/JJG)
                                             **MEMORANDUM OPINION
                                             AND ORDER**

v.

General Casualty Co. of Wisconsin,

                              Defendant.

Robert E. Kuderer, Johnson & Condon, PA, Minneapolis, Minnesota, for Plaintiff.

Dawn L. Gagne, James L. Haigh, Jessica J. Theisen, Cousineau McGuire Chartered, Minneapolis, Minnesota, and Robert C. Burrell, Borgelt, Powell, Peterson & Frauen SC, Milwaukee, Wisconsin, for Defendant.

## INTRODUCTION

Plaintiff Construction Systems, Inc. ("CSI") is in the structural steel fabrication business. In July 2006, lightning damaged its critical machinery. Defendant General Casualty Co. of Wisconsin ("General Casualty") insured CSI at the time. After the lightning strike, more than three years passed with sporadic communications between CSI and General Casualty, yet the claim remained unadjusted and unpaid. CSI then commenced the instant action, alleging breach of the policy and bad faith, among other claims. Each party now moves for partial summary judgment on several claims and defenses. They also seek rulings on the types and amounts of damages CSI may recover under the policy. The Court will grant each Motion in part and deny each in part.

## BACKGROUND

CSI is owned by Wyman and Janice Haberer and run by their son, Perry Haberer. Its manufactures steel support beams for large construction projects.  Integral to its operations is a Peddinghaus Y/1000 System ("the Peddinghaus" or "the system"), a highly customized and automated machine used to fabricate steel beams.  It performed many operations, including measuring, marking, sawing, hole-punching, and drilling.  It was one of only seven such systems ever built and the only one still in use in 2006.  Due to the system's scarcity and customization, replacement parts are not readily available and few people have the expertise to perform repairs on it.  The system allowed CSI to produce steel beams very quickly and accurately; according to Perry Haberer, it was "priceless" to CSI's business.

On July 13, 2006, a lightning strike hit CSI's place of business, causing major damage to the Peddinghaus.  This damage is at the heart of the instant action.

## I.    The insurance policy

At the time of the lightning strike, CSI was insured by General Casualty.  Its policy included a Building and Personal Property Coverage Form (identified as the applicable coverage by both parties), which provided that General Casualty would "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  General Casualty concedes that the Peddinghaus was "Covered Property," that it suffered a "direct physical loss," and that the lightning strike was a "Covered Cause of Loss" under this coverage.

With respect to calculating and paying losses, the Building and Personal Property

Coverage Form covers CSI's buildings or structures as well as its "business personal property" located within its building(s) or on its premises.  It provides, in part, as follows:

**E.  Loss Conditions**

* * *

**4.  Loss Payment**

**a.**  In the event of loss or damage covered by this Coverage Form, at [its] option, [General Casualty] will either:

**(1)**  Pay the value of lost or damaged property; [or]

**(2)**  Pay the cost of repairing or replacing the lost or damaged property.

* * *

[General Casualty] will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends the Valuation Condition.

* * *

**c.**  [General Casualty] will give notice of [its] intentions within 30 days after [it] receive[s] the sworn proof of loss.

* * *

**7.  Valuation**

[General Casualty] will determine the value of Covered Property in the event of loss or damage as follows:

**a.**  At actual cash value as of the time of loss or damage . . .

* * *

3

### G.  Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

* * *

### 3.  Replacement Cost

**a.**  Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

* * *

**c.**  [CSI] may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis.  In the event that [CSI] elect[s] to have loss or damage settled on an actual cash value basis, [it] may still make a claim for the additional coverage this Optional Coverage provides if [it] notif[ies] [General Casualty] of [its] intent to do so within 180 days after the loss or damage.

**d.**  [General Casualty] will not pay on a replacement cost basis for any loss or damage:

**(1)**  Until the lost or damaged property is actually repaired or replaced; and

**(2)**  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

The Coverage Form also contains a section entitled "Limits of Insurance," providing that "[t]he most [General Casualty] will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations."  The "Commercial Property Coverage Part Declaration" for the relevant policy period sets the "Business Personal Property Limit of Insurance" at $4,049,500, with a $5,000 deductible.  It also indicates "Yes" on the line for "Replacement Cost" coverage.  The $4,049,500

limit matches the total value of CSI's equipment reflected on the "Shop Equipment Schedule of Values as of 7-1-06" prepared by Perry Haberer.  The list includes the "Y 1000 Saw/Coper/Marking/Measuring System"; its value is listed as $3,548,368.

The applicable Building and Personal Property Coverage Form also provides that the "Commercial Property Conditions" apply to coverage.  One of the conditions addresses "Concealment, Misrepresentation Or Fraud," providing that:

[General Casualty] will not pay for any loss or damage if the insured has:

1.  Before a loss, willfully; or
2.  After a loss, willfully and with the intent to defraud;

concealed or misrepresented any material fact or circumstances concerning:

(a) This Coverage Part;
(b) The Covered Property;
(c) That insured's interest in the Covered Property; or
(d) A claim under this Coverage Part.

CSI's policy also includes a "Business Income (and Extra Expense) Actual Loss Sustained Coverage Form," which provides coverage for "the actual loss of Business Income [CSI] sustain[s] due to necessary 'suspension' of [its] 'operations' during the 'period of restoration'."  Additionally, "Extra Expense" includes "necessary expenses [CSI] incurs during the 'period of restoration' that [it] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Coverage [sic] Cause of Loss."  With respect to both the business-income coverage and the extra-expense coverage, the Form provides that General Casualty will only pay for the lost income and extra expense "that occurs within 12 consecutive months after the date of direct physical loss or damage."

5

II.     **CSI's claim arising from the lightning strike**

CSI did not immediately notify General Casualty of the lightning strike.  Perry

Haberer mentioned it to CSI's insurance agent, Mike Pehrson of RJF Agencies ("RJF"),

when Pehrson was on-site for an unrelated reason on August 8, 2006, and Pehrson

advised CSI that its insurance covered lightning strikes.  Perry Haberer believed Pehrson

reported the lightning strike to General Casualty immediately after this conversation.

However, according to Gary Howarter, the claim specialist assigned to handle the matter,

General Casualty first learned of CSI's claim on August 24, 2006, and Howarter arranged

to meet with Perry Haberer and visit CSI that same afternoon.

At this initial meeting, Perry Haberer, Pehrson, and Howarter discussed the

lightning damage and the unique challenges of repairing the Peddinghaus.  Howarter's

notes indicate that CSI intended to repair it.  The parties dispute whether the possibility

that CSI would need to *replace* the Peddinghaus was mentioned.  General Casualty

claims it had no idea CSI might need to replace the system until May 2008.  Perry

Haberer asserts, however, that he "indicated the obvious" to Howarter from the start—if

the Peddinghaus could not be fully restored, it would need to be replaced.  The estimated

cost of repairs initially was less than $100,000.[1]  In fact, Perry Haberer purportedly told

Howarter in the fall of 2006 that he was unsure if CSI would even make a claim.

Between September 2006 and May 2008, Howarter periodically inquired about the

status of repairs, and Perry Haberer repeatedly answered that the Peddinghaus was

---

[1] The exact number discussed is unclear from the record.  According to Howarter, Perry
Haberer's estimate at the time was only $30,000; however, in his deposition, Perry Haberer
insists he told Howarter he thought repairs would run somewhere around $70,000 to $100,000.

"limping along" at a diminished capacity and CSI was unwilling to suspend operations for permanent repairs while it had jobs to do.  CSI made numerous attempts to repair the Peddinghaus during this time, but those attempts were unsuccessful.  It did not provide any documentation of these repair costs to General Casualty, and General Casualty did not make any payment to CSI for the loss.

In May 2008, CSI's new insurance agent, Penny Ditter, of Cobb Strecker Dunphy & Zimmermann ("CSDZ"), indicated to Howarter that CSI had decided the Peddinghaus system could not be satisfactorily repaired.  CSI was apparently considering two options—either repairing the system to the extent possible and living with a diminished capacity (at an estimated cost of around $125,000), or replacing it with a used or rebuilt machine (at an estimated cost of $220,000).  Ditter also indicated that a new machine would cost about $1.4 million, but CSI did not want to replace the system at that time.

Also in May 2008, General Casualty reported the claim to Hartford Steam Boiler ("HSB"), another insurance company that reinsured part of CSI's coverage, to investigate whether it should be handled as an "equipment breakdown loss" or a lightning loss.[2] Ditter expressed some concern at this, stating in an e-mail to Howarter, "I hope you don't intend to start arguing causation on this claim nearly 2 years later?"  Pehrson, who was also copied on the e-mail, added that he "share[d] Penny's concerns."  Howarter responded:

---

[2] HSB would have been responsible for the loss if it were an equipment breakdown loss instead of a lightning loss.  Part of the confusion about whether the loss was indeed caused by lightning stemmed from an incorrect date of loss (July 29 rather than July 13) initially recorded in General Casualty's claim files.

> [T]he short answer is NO . . . This is going to be either a lightning loss or a breakdown loss . . . I don't think it can be anything else . . . Both coverage[s] are on the policy . . . It[] would seem to be a matter of what 'bucket' the payment(s) come out of.

Perry Haberer met with Howarter, Ditter, and representatives of HSB on May 22, 2008, to discuss the status of the claim.  He asserts that he expressed CSI's frustrations with the delay in receiving insurance proceeds and explained the huge financial strain the company was under.  He also asserts he offered to resolve the matter if General Casualty would pay the replacement cost of the Peddinghaus listed on the schedule of values, which he understood to be between three and four million dollars.  According to General Casualty, however, no such settlement demand was ever made.  At this same meeting, CSI provided a packet of documents consisting of 12 to 15 pages, including a letter from Maple Machine Services, Inc., containing an estimate to repair or replace one component of the system (the coper) for $120,000.  It is unclear what other documents CSI provided at this meeting.

HSB eventually denied the claim, concluding that the damage was caused by lightning.  Meanwhile, General Casualty began to realize the claim could have a "huge upside if the insured replaces this machine with a new one."  It retained its own engineer to investigate and began trying to determine the appropriate loss amount.  General Casualty's investigator reached the same conclusion as HSB—the loss was due to lightning.  On October 30, 2008, Howarter completed a Large Loss Notice increasing the reserve for CSI's claim from $60,000 to $300,000.  In doing so, he noted the unique nature of the system and CSI's business needs, as well as the attempted repairs.  He

explained that CSI had continued operating while attempting repairs, and the estimated

repair costs were originally believed to be in "the $30-$50k range."  He went on to state:

> As a result of [a joint investigation between HSB and General Casualty's
> electrical engineer] it was determined the damage sustained to this machine
> was a result of lightning.  It was also determined that the insured's machine
> was obsolete and full repairs could not be made.  As a result the insured
> purchased a used machine and is in the process of installing the equipment
> at this time.  We have been advised that replacement of the machine
> including the installation is slightly less than $300,000.  We are waiting for
> the final invoices from the insured to support the replacement and
> installation costs.  We will proceed to settle with the insured at that time.

The record also contains a letter dated October 30, 2008, to RJF Agencies, CSI's

former insurance broker.  The letter is signed "Claims Department," and defense counsel

conceded at oral argument that the letter came from General Casualty.  It states, "Dear

Agent:  The claim referenced above has been concluded and closed."  It also reflects the

claim number, the policy number, the (incorrect) date of loss, and a total amount paid of

zero.  The letter does not indicate it was copied to CSI, but Perry Haberer claims he

received the letter and interpreted it as a denial of the claim.  General Casualty maintains,

however, that the letter was automatically generated when HSB denied the *reinsurance*

claim after determining the loss was due to lightning rather than equipment breakdown.

Between September and December of 2008, General Casualty's claim notes show

several calls to CSI requesting invoices and documentation of the work being done on the

Peddinghaus.  On numerous occasions, Howarter spoke to Perry Haberer's assistant,

Kelly.  For instance, a claim note from October 15 states, "Kelly told me that invoices are

still coming in.  She does not know the amount of the invoices.  I asked her to relay to

Perry that if he has ANYTHING to provide me at this time knowing that it is not the final

9

package, I would appreciate it." Similarly, a November 20 entry states, "Spoke with Kelly . . . They are still getting invoices in. I reminded her that I am willing to pick up a partial invoice package." And another conversation on December 4 was noted as "a mirror" of the one on November 20.

## III.   CSI's Proof of Loss and General Casualty's response

On December 10, 2008, having still not received documentation of the claim, General Casualty mailed CSI a letter and a Sworn Statement in Proof of Loss ("Proof of Loss") form, which was to be returned to General Casualty within 60 days, together with supporting documentation. When Perry Haberer received it, he contacted Ditter and CSDZ seeking assistance.[3] He testified that he was promised help but never received it. As the deadline to return the Proof of Loss approached, he rushed to complete it himself. He believed he should include everything he could with the Proof of Loss and then General Casualty would work with CSI to sort it out. During this time, Perry Haberer also contacted an attorney.

Ultimately, CSI submitted its executed Proof of Loss on February 9, 2009, together with four boxes of documents and a cover letter from its attorney. The Proof of Loss claims a total loss amount of $20,097,658.58. The cover letter also indicates that:

> [t]he magnitude and complexities of the losses do not lend themselves readily to being memorialized on the Proof of Loss form [General Casualty] [has] provided, even with the use of attachments as CSI has employed in its submittal. Accordingly, CSI is providing detailed loss calculations made by the business and voluminous back-up documentation.

---

[3] For her part, Ditter does not recall being asked for assistance completing a Proof of Loss by Perry Haberer or anyone else at CSI.

CSI attached a list of itemized costs to the Proof of Loss, which listed (among other things) over $1.1 million for a "new line," more than $5.8 million for "productivity loss," and $10.26 million for "lost profit."[4]  The Proof of Loss was completed by Perry Haberer and signed (under oath) by his father, Wyman.  Wyman Haberer admits, however, that he did not participate in calculating any portion of the claim and could not verify or explain its specific numbers.

The documents submitted with CSI's Proof of Loss include a number of coversheets corresponding to various categories of claimed losses.  Each contains a title, a brief description of what the loss relates to, a breakdown of costs, and a total.  For example, one cover sheet entitled "Time" purports to reflect "Time to Work on the Beam Line After Lightning Strike.  Involved Pulling Wire and Removing Items."  It indicates calculations of "262 hours x $65/hr," and "Total = $17,030.00."  The "Lost Jobs & Lost Profits" coversheet provides, "We couldn't take any more projects due to equipment not working."  It breaks down CSI's lost jobs as follows:  $14 million for September 2006 to June 2007; $16 million for July 2007 to June 2008; and $8 million for July 2008 to January 2009.  It then states, "38 million Lost Profit at 12% = $4,560,000.00" and "38 million Lost Overhead at 15% = $5,700,000.00," for a total of $10,260,000.00 (Id. Ex. 12.)  Perry Haberer explained that these numbers were based on his estimates and projections using the profit margins at which CSI customarily bid its jobs.  According to

---

[4] There are two copies of this itemized list in the record, one reflecting a total of just over $20 million (corresponding to the total loss claimed on the Proof of Loss form) and the other a total of $24.5 million.  The difference between the lists is due to $4,412,307.90 for "inefficiency," Perry Haberer indicated in his Examination Under Oath that CSI has withdrawn.

General Casualty, there were no corresponding documents to substantiate the amounts listed on many of these coversheets, including the one for Lost Jobs and Lost Profits. Perry Haberer also acknowledged that many of the numbers included on the coversheets supporting CSI's claim were not supported by other documents.

After receiving CSI's Proof of Loss, General Casualty's attorney sent a letter to the Haberers on February 16, 2009, indicating that it would be investigating and evaluating the claim. In addition, it advised the Haberers of General Casualty's intention to conduct Examinations Under Oath ("EUOs") of both Perry and Wyman Haberer, as allowed by the policy, and it requested production of relevant documents for inspection prior to the EUOs. This letter was followed by a series of communications between counsel regarding document production and scheduling conflicts. At one point in April 2009, CSI expressed concern that General Casualty had not "give[n] notice of [its] intentions within 30 days" after receiving CSI's Proof of Loss, as the policy required. CSI stated it would "appreciate receiving the 'notice of intentions' soon," particularly "whether General Casualty [was] acknowledging coverage." General Casualty did not directly respond to this concern. Eventually, CSI produced documents for inspection, which were examined on June 3, 2009; General Casualty then requested additional records. The EUOs of Perry and Wyman Haberer were taken on June 23 and 24, 2009, but both were adjourned pending General Casualty's receipt of additional records.

Nine months after CSI submitted its Proof of Loss, the claim remained unpaid. On November 30, 2009, CSI filed an amended Sworn Statement of Proof of Loss ("Amended Proof of Loss"), claiming a total loss of $32,435,014.45. Its cover letter explained that

12

"General Casualty denied CSI's previous Proof of Loss, months after it was submitted, due in part to a claimed lack of 'substantiation' of CSI's stated losses."  No record of this "denial" has been submitted to the Court, however.  The Amended Proof of Loss included an Appendix which listed the "known loss amounts," including $10 million for replacement of the Peddinghaus, $15.6 million for "lost jobs," and $4.5 million for "total lost profit on jobs."  Aside from this Appendix, no additional documentation was provided with the Amended Proof of Loss.

General Casualty responded on December 3, 2009, stating:

> General Casualty finds it necessary to reject the Sworn Statement in Proof of Loss because the amounts were unsubstantiated.  Since [CSI's] claims have increased dramatically over [its] prior Proof of Loss, please submit any additional documents that you have to support the current claim.  No documents whatsoever accompanied [CSI's] [Amended] Sworn Statement in Proof of Loss dated November 30, 2009.  Please submit any additional documents you have to support CSI's claim within the next 60 days.

General Casualty also indicated that it wished to continue the EUO of Perry Haberer.  It went on to explain that it was disputing more than simply the amounts due under the policy related to CSI's claim.  It was also "evaluating whether CSI engaged in fraud, false swearing or overvaluation."

## IV.    The lawsuit

On December 23, 2009, CSI commenced the instant action, asserting the following ten claims against General Casualty:

1. Breach of contract;
2. Breach of duty of good faith and fair dealing;
3. Tortious interference with protected property interest;
4. Tortious interference with contracts and business relationships;
5. Tortious interference with potential business and contractual relations;

6.  Tortious interference with business expectancy;
7.  Bad faith claims handling in violation of Minn. Stat. § 604.18;
8.  Violation of Minnesota Uniform Deceptive Trade Practices Act ("DTPA");
9.  Damage to business reputation; and
10.  Declaratory judgment that the policy provides unlimited coverage, among other things.

In its Answer, General Casualty asserted a number of affirmative defenses, including failure by CSI to comply with conditions precedent under the policy, spoliation of evidence, and fraudulent overvaluation of the claim.  It also raised various coverage limitations under the policy.  In June 2010, General Casualty moved for summary judgment on two of these limitations, asking for a determination as a matter of law that the policy (1) limited recovery for business-interruption losses to 12 months after the date of the loss, and (2) did not allow CSI to recover the replacement cost value ("RCV") of the Peddinghaus (as opposed to the actual cash value, or "ACV") because it did not give notice of its intent to do so within 180 days of the loss.  The Court granted its motion in part, finding that CSI's recovery for business-interruption losses was limited by the policy to a period of 12 months following the loss.  It also determined, however, that based on the record before it, fact questions prevented summary judgment as to whether CSI could recover RCV.

Discovery has nearly concluded, and each party has now moved for partial summary judgment on various claims and defenses.  The Court determined it would hear and consider the Motions together.  (See Order dated April 1, 2011 (Doc. No. 102).)  Each has now been briefed, a hearing was held on July 19, 2011, and the matter is ripe for decision.

14

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering General Casualty's Motion, the Court views the record in the light most favorable to CSI, and when considering CSI's Motion, the Court views the record in the light most favorable to General Casualty. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.) (citation omitted), aff'd, No. 10-3532, 2011 WL 873121 (8th Cir. Mar. 15, 2011).

15

**ANALYSIS**

General Casualty's Motion seeks dismissal of every claim in CSI's Second

Amended Complaint except the breach-of-contract and declaratory-judgment claims.  It

also seeks to limit CSI's potential recovery for damage to the Peddinghaus to $4,049,500.

Conversely, CSI seeks a declaration that its damages under the policy are unlimited, as

well as a determination that General Casualty is liable as a matter of law for breach of

contract.  It also seeks dismissal of General Casualty's affirmative defenses.  The Court

will address in turn the claims at issue, the defenses, and the issues regarding damages.

**I.     CSI's claims**

    **a.  Breach of contract (Count 1)**

CSI seeks summary judgment on its claim that General Casualty breached the

policy by unreasonably delaying the processing of its claim, sending a denial letter, and

failing to pay anything towards its claimed losses from the July 2006 lightning strike.

For its part, General Casualty concedes that the Peddinghaus was covered property and

the lightning strike was a covered loss.  It raises a number of defenses, however, which

could excuse its performance under the policy.  Because the Court concludes that some of

its defenses will survive at this juncture, as discussed below, it cannot find General

Casualty liable for breaching its contract as a matter of law.

    **b.  Breach of duty of good faith and fair dealing (Count 2)**

Good faith and fair dealing is an implied covenant in every contract under

Minnesota law,[5] including insurance contracts.  E.g., Short v. Dairyland Ins. Co., 334

N.W.2d 384, 387 (Minn. 1983).  CSI alleges that General Casualty breached this

covenant.  General Casualty contends, however, that this claim simply duplicates CSI's

breach-of-contract claim.  The Court agrees.

While Minnesota law recognizes the implied covenant of good faith and fair

dealing, it does not recognize a separate cause of action for breach of this covenant where

the claimed breach arises from the same conduct as a breach-of-contract claim.  E.g.,

Medtronic, Inc. v. ConvaCare, Inc., 17 F.3d 252, 256 (8th Cir. 1994) ("Minnesota law

does not recognize a cause of action for breach of the implied covenant of good faith and

fair dealing separate from the underlying breach of contract claim.") (citations omitted);

U.S. Salt, Inc. v. Broken Arrow, Inc., Civ. No. 07-1988, 2008 WL 398818, at *8 (D.

Minn. Feb. 11, 2008) (Kyle, J.), aff'd, 563 F.3d 687 (8th Cir. 2009) (granting summary

judgment on claim for breach of the implied covenant of good faith and fair dealing

where it duplicated a breach-of-contract claim).  CSI bases its breach-of-implied-

covenant claim on the same conduct as its breach-of-contract claim—General Casualty's

delays and failure to pay pursuant to the terms of the policy.

In an attempt to save this claim, CSI cites Kissoondath v. U.S. Fire Insurance, 620

N.W.2d 909 (Minn. Ct. App. 2001), which noted several actions an insurer should take to

carry out its duty of "good faith" and held that failure to take any one of them could

constitute a breach of the duty.  CSI contends that General Casualty failed to take some

---

[5] Neither party suggests that any other state's law applies in this case.  See BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (law of forum state applies by default where parties do not raise choice-of-law issue).

of the actions <u>Kissoondath</u> listed and thus breached its duty of good faith. Yet

<u>Kissoondath</u> did not deal with the *implied covenant* of good faith and fair dealing at issue

here; rather, it addressed an insurer's *fiduciary duty* of good faith, and it dealt specifically

with an insurer's fiduciary duty in the context of defending its insured against a third

party's claim. While that duty is measured by a standard of good faith, it is distinct from

the implied covenant of good faith and fair dealing on which CSI bases its claim.[6] CSI's

reliance on <u>Kissoondath</u> is thus misplaced and cannot save its claim.

### c. Tortious interference (Counts 3–6)

CSI's asserts four separate tortious-interference claims. General Casualty seeks

dismissal of all four, arguing they fail as a matter of law because CSI cannot establish

that any independent tort was committed.[7] The Court agrees.

Minnesota courts have long held that "a party is not entitled to recover tort

damages for a breach of contract absent an 'exceptional case' where the breach of

contract constitutes or is accompanied by an independent tort." <u>Cherne Contracting</u>

---

[6] CSI appears to recognize the distinction between the fiduciary duty of good faith and the implied covenant of good faith and fair dealing in an insurance contract. (<u>See</u> Pl. Mem. in Opp'n at 8 ("Insurers have a fiduciary duty to deal in good faith with their policyholders. . . . Likewise, insurers have a duty of good faith and fair dealing under an insurance contract." (citations omitted).) Yet it attempts to conflate the two concepts in its opposition brief. The Complaint, however, clearly alleges a claim for breach of the covenant of good faith and fair dealing. (<u>See</u> 2d Am. Compl. ¶¶ 77-82 (averring that "CSI and General Casualty are parties to a contract which incorporates a *covenant of good faith and fair dealing*," and that CSI incurred damages "as a result of General Casualty's breach of the *covenant of good faith and fair dealing*" (emphases added)).) CSI may not amend its Complaint through its brief to avoid dismissal.

[7] General Casualty argues that two of the four claims—tortious interference with business expectancy (Count 6) and tortious interference with prospective property interest (Count 3)—also fail because they are not recognized causes of action under Minnesota law. The Court need not address this issue, however, because it determines there is no independent tort sufficient to support the claims.

Corp. v. Wasau Ins. Co., 572 N.W.2d 339, 343 (Minn. Ct. App. 1997) (quoting Wild v.

Rarig, 234 N.W.2d 775, 779-80 (Minn. 1975)); accord Jones v. W. Union Fin. Servs.,

Inc., 513 F. Supp. 2d 1098, 1100 (D. Minn. 2007) (Doty, J.).  An independent tort exists

if there is a "breach of duty which is distinct from the breach of contract."  Hanks v.

Hubbard Broad., Inc., 493 N.W.2d 302, 308 (Minn. Ct. App. 1992).  Stated differently, a

tort is independent from a breach of contract (and a separate cause of action can thus be

brought) if "a relationship would exist which would give rise to the legal duty without

enforcement of the contract promise itself."  Id.; see Jones, 513 F. Supp. 2d at 1100-01.

In this case, each of CSI's tortious-interference claims stems from General

Casualty's delays and failure to pay CSI's claim.  CSI argues that General Casualty

"knew CSI was losing money, losing potential business and damaging potential business

relationships," yet "refused to honor its duty to CSI."  (Pl. Mem. in Opp'n at 12.)  All of

the wrongful conduct CSI identifies stems from General Casualty's *contractual* duties—

absent its contract with CSI, General Casualty would have had no obligation to timely

investigate, respond to the claim, or indemnify CSI at all for any of the losses at issue.

Where a plaintiff alleges "a breach of duty identical to the breach of contract," as CSI has

done here, its tort claim cannot survive.  Jones, 513 F. Supp. 2d at 1101.

CSI contends, however, that its tortious-interference claims can exist

independently of the breach of contract because General Casualty's conduct breached an

independent duty—namely, the covenant of good faith and fair dealing.  It relies upon

Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. Partnership, which noted that

"[c]onduct breaching a contract may also amount to an independent tort leading to

liability where a separate duty arises out of a contractual relationship." 977 F. Supp. 1386, 1394 (D. Minn. 1997) (Alsop, J.) (quoting Am. Bus. Interiors v. Haworth, Inc., 798 F.2d 1135, 1145 (8th Cir. 1986) (citations omitted)). Yet the covenant of good faith does not create the separate duty CSI needs to save its tortious-interference claim. In Wild v. Rarig, the Minnesota Supreme Court case establishing that a plaintiff may not recover in tort for a breach of contract, the plaintiff made the same argument CSI makes here: the defendant's "bad-faith or malicious breach" of the implied covenant of good faith permitted a tort remedy in addition to a contract one. 234 N.W.2d at 790. The court flatly rejected this argument, holding that even "[a] malicious or bad-faith motive in breaching a contract does not convert a contract action into a tort action." Id.

In the Court's view, the instant case arises out of the contract between CSI and General Casualty, and CSI cannot expand its recovery by adding tort claims in the absence of any tort independent from General Casualty's contractual duties.

### d.  Violation of Minn. Stat. § 604.18 (Count 7)

Minnesota Statute § 604.18, enacted in 2008, "revers[ed] a line of Minnesota cases which had consistently refused to recognize bad faith denial claims." Davis v. Grinnell Mut. Reinsurance Co., Civ. No. 09-2563, 2010 WL 5464915, at *3 (D. Minn. Dec. 30, 2010) (Ericksen, J.). In pertinent part, it provides that an insured may recover specified damages, costs, and attorneys' fees if it can show the "absence of a reasonable basis for denying the benefits of the insurance policy" and that the insurer "knew" or acted in "reckless disregard" of this lack of a reasonable basis. Minn. Stat. § 604.18, subd. 2(a).

It also provides, however, that "[a]n insurer does not violate [it] by conducting or

cooperating with a timely investigation into . . . fraud." Id. § 604.18, subd. 2(c).

In seeking summary judgment on this claim, General Casualty first argues that the

statute does not apply to conduct prior to August 1, 2008, and thus any part of CSI's

claim based on "bad faith" allegedly committed before that date cannot survive.  It is

correct.  The statute became effective on August 1, 2008, and there is no suggestion that

it was meant to apply retroactively.  See Minn. Stat. § 645.21 ("No law shall be construed

to be retroactive unless clearly and manifestly so intended by the legislature.").  CSI

appears to acknowledge as much, and it does not argue that its bad-faith claim under the

statute is based on any conduct that occurred prior to August 1, 2008.

General Casualty further contends that it did not act in bad faith after that date

because it was "fairly debatable" whether there was coverage.  While few Minnesota

courts have interpreted the statute to date, cases from Wisconsin (upon whose common-

law bad-faith action the Minnesota law was modeled) provide guidance.  See, e.g.,

Anderson v. Cont'l Ins., 271 N.W.2d 368, 376 (Wis. 1978) ("To show a claim for bad

faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the

policy and the defendant's knowledge or reckless disregard of the lack of a reasonable

basis for denying the claim."); see also Davis, 2010 WL 5464915, at *3 (citing Anderson

and noting that § 604.18 is based upon common-law bad-faith causes of action such as

the one recognized in Wisconsin).  Under Wisconsin law, an insured may only assert bad

faith "where the validity of the claim was not even fairly debatable."  Anderson, 271

N.W.2d at 376.  This is because an insurer "may challenge claims which are fairly

debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." Id. at 376.

Thus, the question here is whether General Casualty had a reasonable basis for refusing to pay CSI's claim. Wisconsin courts have held that a concealment or fraud provision in a policy may establish a reasonable basis for an insurer to deny a claim if it suspects the insured may have engaged in fraud. See State Farm Fire & Cas. Ins. Co. v. Walker, 459 N.W.2d 605, 608 (Wis. Ct. App. 1990).[8] Relying upon Walker, General Casualty contends that it did not violate the bad-faith statute as a matter of law. As it acknowledged at oral argument, however, General Casualty never raised the issue of fraud prior to December 2009—instead, it contends its earlier refusals to pay were based on the fact the claim was not substantiated. CSI argues that General Casualty acted in bad faith between August 1, 2008, and December 2009, before General Casualty ever invoked the fraud provision. It points to the October 2008 letter (which it argues was a "denial letter"), the fact General Casualty did not even request a Proof of Loss until December 2008, and the failure to pay even an undisputed portion of the loss. Because this conduct occurred before it expressed any concern about fraud, General Casualty cannot rely upon Walker. In the Court's view, there is a genuine issue of material fact as to whether lack of substantiation created a reasonable basis for failing to pay the claim (thus making the claim "fairly debatable") between August 1, 2008, and December 2009.

---

[8] The provision at issue in Walker was very similar to that in General Casualty's policy. It provided, "If you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss, then this policy is void as to you and any other insured." 459 N.W.2d at 608.

**e.  Minnesota Uniform Deceptive Trade Practices Act (Count 8)**

CSI also asserts that General Casualty violated Minnesota's DTPA, both by its representation at the time the policy was issued that it would pay claims for damage to covered property caused by covered causes of loss, and again when Howarter assured CSI that this specific claim would be paid and it was simply a matter of determining what "bucket" the payments should come from.  Because General Casualty has not paid the claim, CSI contends that these representations were deceptive and violated the DTPA. General Casualty seeks summary judgment on this claim, arguing that the only remedy for deceptive trade practices is injunctive relief, and an injunction in this case would serve no purpose.  The Court agrees.

Under Minnesota law, the "sole statutory remedy for deceptive trade practices is injunctive relief." Simmons v. Modern Aero, Inc., 603 N.W.2d 336, 339 (Minn. Ct. App. 1999).  "Because the [DTPA] provides [injunctive] relief for a 'person likely to be damaged,' it provides relief from future damage, not past damage." Gardner v. First Am. Title Ins. Co., 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003) (Kyle, J.) (quoting Lofquist v. Whitaker Buick-Jeep-Eagle, Inc., No. C5-01-767, 2001 WL 1530907, at *2 (Minn. Ct. App. 2001)).  Here, CSI attempts to argue that it is entitled to an injunction prohibiting General Casualty "from maintaining its position that it is not responsible for paying benefits," because the "refusal to pay benefits is an ongoing action."  (Pl. Mem. in Opp'n at 16.)  Yet this future "harm" it alludes to is not linked to allegedly deceptive representations; instead, it is the very harm CSI seeks to redress through its breach-of-contract claim.  CSI has shown no likelihood of future harm based on General Casualty's

representations about payment—indeed, given the history between the parties with respect to *this* claim, CSI is not likely to have future dealings with General Casualty. Because an injunction, which is the only remedy available under the DTPA, would serve no purpose in the instant case, the claim cannot survive.

### f.  Damage to business reputation (Count 9)

General Casualty next seeks summary judgment on CSI's damage-to-business-reputation claim, arguing that this claim again arises from the alleged breach of contract.[9] It contends that the claim fails as a matter of law because no cause of action for damage to business reputation is recognized in Minnesota.  In response, CSI relies upon <u>Upsher-Smith Laboratories, Inc. v. Mylan Laboratories, Inc.</u>, for the proposition that "injury to business reputation is compensable by money damages" under Minnesota law.  944 F.Supp. 1411, 1436 (D. Minn. 1996) (Davis, J.) (adopting Report and Recommendation of Erickson, M.J.).  General Casualty contends, however, that <u>Upsher-Smith</u> and the cases on which it relies only support business-reputation *damages* arising from a breach of contract and do not recognize damage to business reputation as a stand-alone *claim*.[10]

---

[9] Indeed, CSI's Complaint avers that General Casualty's "breach of contract ultimately caused the damage to [CSI's] business reputation and goodwill." (2d Am. Compl. ¶ 126; <u>accord</u> P. Haberer Dep. at 133 ("Q. My question is, is the damage to your business reputation what you're saying came about because General Casualty didn't pay the claim?  A. I agree with that statement.").)

[10] Initially, because of its view that damage to business reputation was not a recognized cause of action in Minnesota, General Casualty assumed this claim was based on defamation, and it argued that CSI could not prove defamation as a matter of law.  (<u>See</u> Def. Mem. in Supp. at 21-22.)  CSI's response clarified that this count was <u>not</u> intended to be a defamation claim.  Accordingly, at oral argument, General Casualty instead argued there is no cause of action for damage to business reputation under Minnesota law.

The Court agrees with General Casualty.  Although <u>Upsher-Smith</u> denied summary judgment on a claim for damage to business reputation, thus implying that such a claim is viable, the cases it relied upon do not actually recognize a separate cause of action.  Instead, they permit plaintiffs to recover for harm to business reputation as a component of damages based on other underlying claims.  <u>E.H. Boerth Co. v. LAD Props.</u>, 82 F.R.D. 635, 646 (D. Minn. 1979) (MacLaughlin, J.) (approving additional $5,000 damage award for "loss of professional reputation as special damages for the breach of contract"); <u>Bonhiver v. Graff</u>, 248 N.W.2d 291, 304 (Minn. 1976) (affirming award of $10,000 representing damages for loss of business reputation in negligence case).  Thus, to the extent Count Nine asserts a separate cause of action, it fails as a matter of law because no such claim is recognized in Minnesota.

## II.  General Casualty's affirmative defenses

General Casualty has asserted a number of affirmative defenses in this action, including fraud, failure to comply with policy conditions, and spoliation of evidence.  CSI has moved for summary judgment on each of these defenses, urging the Court to dismiss them.  The Court takes up each defense in turn.

### a.  Fraud

General Casualty contends that CSI fraudulently overvalued its claim when it submitted its Proof of Loss and Amended Proof of Loss, and it argues this fraud voids the entire policy and precludes any recovery.  Specifically, it relies on the policy clause providing, "[General Casualty] will not pay for any loss or damage if any insured has . . . [a]fter a loss, willfully and with the intent to defraud[,] concealed or misrepresented any

material fact or circumstances concerning . . . [a] claim under this Coverage Part."  CSI

seeks summary judgment on this defense, arguing General Casualty has not presented

sufficient evidence creating a genuine fact issue regarding whether it engaged in fraud.

Proving fraud under Minnesota law requires showing that someone made a false

representation, "knowing it to be false or without knowing whether it was true or false,"

with the intention of inducing another to act in reliance on it.  E.g., Children's Broad.

Corp. v. Walt Disney Co., 235 F.3d 1008, 1020 (8th Cir. 2001) (quoting Berryman v.

Riegart, 175 N.W.2d 438, 442 (Minn. 1970)).  The policy at issue here reflects this rule

by requiring the misrepresentation to be made "willfully or with the intent to defraud" in

order to trigger the fraud provision.  CSI stresses this need to prove willfulness or intent

to establish fraud, and it contends that General Casualty's allegations of fraud are "bald"

and unsupported by any evidence of such intent in the record.  The Court does not agree.

Fraudulent intent "may be proved by showing that the party knew his statements

to be false; or that, having no knowledge of their truth or falsity, he did not believe them

to be true; or that, having no knowledge of their truth or falsity, he yet represented them

to be true of his own knowledge."  Berryman, 175 N.W.2d at 442.  Moreover, "[w]hether

a statement is a willful or intentional misstatement is a question of fact."  Henning Nelson

Constr. Co. v. Fireman's Fund Am. Life Ins. Co., 383 N.W.2d 645, 654 (Minn. 1986)

(citing Hodge v. Franklin Ins. Co., 126 N.W. 1098, 1099 (1910)).[11]  Here, there is ample

---

[11] CSI appears to acknowledge that whether a false statement is made willfully and intentionally
is a fact question.  (See Pl. Mem. in Supp. at 24 ("Unless intent to deceive is proved *to the
satisfaction of the trier of the facts*, it will be presumed that the insured was innocent of fraud or

evidence that Perry Haberer made statements on the Proof of Loss and Amended Proof of Loss about the amount of loss, and Wyman Haberer admits he signed the Proof of Loss under oath without personally verifying the values—thus, "represent[ing] them to be true" while "having no knowledge of their truth or falsity."  See Berryman, 175 N.W.2d at 442.  Many of the values listed were not supported by documentation aside from conclusory coversheets.  There is also evidence that CSI's accountant, who prepared its annual tax returns and financial statements, noticed no unusual changes in the company's expenses or revenues between 2006 and 2009 as compared to the years prior to the lightning strike, while CSI claimed over $10 million in lost profits on its Proof of Loss for this same time period.  In the Court's view, there is sufficient evidence from which a jury could reasonably conclude that Perry and/or Wyman Haberer misrepresented the true amount of CSI's loss and did so with fraudulent intent.

### b.  Failure of policy conditions

General Casualty also argues that CSI "has failed to fulfill conditions precedent to suit by failing to comply with loss conditions of the policy" and has "failed to fulfill conditions precedent of the Insurance Contract."  (Answer to 2d Am. Compl. ¶¶ 135-36.) It contends that these failures preclude CSI from recovering anything under the policy. Specifically, General Casualty identifies CSI's failure to provide documentation

---

false swearing.") (quoting Joseph Supornick & Son v. Imperial Assurance Co. of N.Y., 87 F. Supp. 232, 235 (D. Minn. 1950)).

substantiating its claim and the Haberers' failure to submit to continued EUOs.[12]  CSI moves for summary judgment on this defense as well.[13]

CSI first argues that General Casualty has waived any defense based on failure of conditions because it did not timely accept or reject the Proof of Loss and because it issued a denial.  See Royal Ins. Co. v. Martin, 192 U.S. 149, 162 (1904) (conditions requiring an insured to produce proof of its claim are dispensed with where there is "a general, absolute refusal to pay in any event, or a denial by the [insurer] of all liability under its policy.").  The Court need not address the issue of waiver, however, because this defense fails even if General Casualty did not waive it through actual or constructive denial of the claim.

CSI correctly contends that submitting to an EUO or furnishing a proof of loss are not conditions precedent to *suit*, but rather conditions required for *recovery*.  E.g., Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co., 615 N.W.2d 341, 345, 347 (Minn. 2000).  The Minnesota Supreme Court has further recognized that an insured's failure to comply with one of these conditions is not a complete bar to recovery.  Id. at 347 (citing McCullough v. Travelers Co., 424 N.W.2d 542, 545 (Minn. 1988)).  In order to avoid liability under a policy, an insurer must show it was prejudiced by the insured's failure to comply with the policy conditions.  E.g., Martin v. State Farm Fire & Cas. Ins. Co., --- F. Supp. 2d ---,

---

[12] Conditions in the policy require CSI to "[p]rovide [General Casualty] with records and documents reasonably related to the loss," submit a "signed, sworn proof of loss" within 60 days of it being requested, and submit to an EUO.  (Thiesen Aff. Ex. 34 at 1006114.)

[13] CSI also seeks dismissal of this defense based on a policy condition that purportedly required CSI to give notice of its intent to replace the Peddinghaus within 180 days.  The failure of notice defense will be dismissed, however, as set forth in the Court's discussion of replacement-cost-value damages.  (See infra, note 17.)  Thus, it does not factor into the analysis here.

2011 WL 2437060, at *6-7 (D. Minn. June 16, 2011) (Kyle, J.) (allowing insureds' claim to proceed despite failures to provide financial records, furnish proof of loss, and submit to EUOs where there was no evidence the insurer was prejudiced by their failures).

Here, General Casualty has made no argument that it was prejudiced by CSI's failure to provide adequate documentation or the Haberers' failure to submit to continued EUOs. It simply argues that it could not substantiate—and thus could not pay—CSI's claim due to these failures. However, while CSI undoubtedly could have been more cooperative, General Casualty has nonetheless had more than adequate time and opportunity to investigate the claim. The record reflects that Perry and Wyman Haberer each submitted to an EUO in June 2009. Although they did not participate in continued EUOs, both have since been extensively deposed in connection with the instant action.[14] The record also shows that CSI provided boxes of documents with its Proof of Loss to General Casualty and, on at least one occasion, General Casualty sent people to CSI's offices to review 30 to 60 boxes of documents that CSI had made available. There is nothing to suggest it could not have conducted further document review had it so chosen. Furthermore, it has now had the whole panoply of discovery tools at its disposal to seek information about the amount of the loss claimed. In short, the Court perceives no

---

[14] At the hearing on these Motions, counsel for General Casualty argued that a deposition is *not* the same as an EUO because of time limitations, the right to make objections based on the rules of evidence, and the permitted scope. Yet the Rules of Civil Procedure specifically provide that depositions are <u>not</u> limited by rules regarding relevance, the witness must answer despite objections (with a few exceptions, such as for privilege), and the Court should allow additional time for a deposition if needed. <u>See</u> Fed. R. Civ. P. 30(c). In short, this Court perceives no real difference between the two and certainly no reason General Casualty could not have obtained the information it sought regarding CSI's claim through depositions as well as through EUOs.

prejudice (and General Casualty has identified none) resulting from CSI's alleged failures to comply with policy conditions, and thus its failures do not operate to bar recovery.[15]

### c. Spoliation

General Casualty asserts that it recently discovered CSI failed to retain all components of the Peddinghaus and other evidence following the lightning strike and failed to inform General Casualty's investigators that it had made various repairs and replacements, thus denying them the opportunity to examine all the damaged property. CSI moves for summary judgment on the spoliation argument, but its briefs are entirely devoid of any argument why it is entitled to summary judgment on this defense. At oral argument, counsel for CSI merely stated that the spoliation issue is "relatively new" to the case and is, in its view, unsupported. In the absence of any argument on this defense, the Court will not grant summary judgment.

Moreover, the Court will be better able to address the spoliation defense at a later date. Magistrate Judge Graham recently granted General Casualty's request to enter CSI's property to conduct further inspection in light of its recent concerns. Once this inspection is complete, the parties will be in a position to more fully address the spoliation issue in advance of trial, and the Court may then determine appropriate sanctions if necessary. See, e.g., Hoffman v. Ford Motor Co., 587 N.W.2d 66, 71 (Minn. Ct. App. 1998) (noting a court may impose sanctions for spoliation based upon the prejudice caused to the opposing party) (citations omitted).

---

[15] Nonetheless, the Court notes that CSI will be required to prove its damages if it hopes to recover at trial; this will undoubtedly require it to present its "substantiation" to a jury in a more helpful and forthcoming manner than it appears to have provided it to General Casualty.

### III.   CSI's potentially recoverable damages

In Count 10 of its Second Amended Complaint, CSI seeks a declaration of rights and obligations under the policy.  It moves for summary judgment on portions of that claim—namely, that (1) its "covered property" was damaged by a "covered cause of loss" under the policy, (2) it is entitled to replacement cost benefits under the policy, (3) it is entitled to business-income and extra-expense coverage, and (4) its recovery is unlimited by the policy's terms.  General Casualty has also cross-moved for summary judgment on the issue of whether CSI's recovery is limited, arguing that the policy's terms impose a limit of $4,049,500 on recovery for damage to the Peddinghaus itself.

With respect to the first issue, General Casualty has conceded that the Peddinghaus was "covered property" under the policy and the lightning strike was a "covered cause of loss."  Hence, the policy provides coverage for the loss unless General Casualty succeeds on an affirmative defense that voids coverage.

General Casualty has not similarly conceded the types and amount of recovery allowed under the policy.  These questions involve the interpretation of the insurance policy, which is governed by state law.  Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003).  Under Minnesota law, interpreting an insurance policy is a question of law for the Court.  Watson v. United Servs. Auto. Ass'n, 566 N.W.2d 683, 688 (Minn. 1997).  When policy language is unambiguous, it is interpreted "in accordance with its plain and ordinary meaning."  Ill. Farmers Ins. Co. v. Glass Serv. Co., 683 N.W.2d 792, 799 (Minn. 2004).  When an insurance policy's language is ambiguous, the Court will generally construe that language against the drafter

31

(the insurer) and in favor of the insured.  Nathe Bros., 615 N.W.2d at 344.  The Court

will take up the portions of CSI's declaratory-judgment claim listed above in turn.

### a. Replacement cost value

CSI asks the Court to determine that it is entitled to replacement cost value, or

RCV, under the policy as a matter of law.  General Casualty's previous summary-

judgment motion addressed the related issue of whether the policy required CSI to give

notice within 180 days of its intent to pursue RCV.  At that time, the Court determined

that fact questions prevented summary-judgment because (1) it was unclear whether

CSI's initial claim was for RCV or ACV, and (2) if its claim was initially for ACV (thus

triggering the notice requirement), it was unclear whether CSI gave General Casualty

notice of its intent to replace the Peddinghaus within 180 days.  As discussed in the

Court's order on that Motion (Doc. No. 40), however, the policy appears to make RCV

the default type of recovery.  (See Thiesen Aff. Ex. 34 at 1006103 ("Replacement Cost

(without deduction for appreciation) replaces Actual Cash Value in the Loss Condition,

Valuation [section] of this Coverage Form.").  It also provides that an insured may alter

the default and claim ACV or may claim ACV and then later add a claim for RCV,

provided it gives notice of its intent to include the RCV claim within 180 days.  General

Casualty maintains that the 180-day notice provision applies and provides a defense to

CSI recovering RCV for the damage to the Peddinghaus.  Yet although the record is

much more extensive than it was at the first summary-judgment motion, there remains <u>no</u> evidence to suggest that CSI made its initial claim on an ACV basis.[16]

In the Court's view, after reviewing the record at this stage, General Casualty has presented no evidence to create a genuine issue of material fact that CSI initially claimed ACV.  Additionally, upon further review of the policy, the Court concludes that the "default" type of claim under the policy is indeed one based on replacement cost.  Since there is nothing to suggest that CSI altered this default, it follows that CSI's recovery, if any, under the policy should be based on replacement cost value of the Peddinghaus.  Hence, if CSI can prove that General Casualty breached the policy, it may seek replacement-cost damages (subject, of course, to the other limits discussed herein).  It also follows that the 180-day notice requirement was not triggered, and General Casualty's defense on that basis must be dismissed.[17]

### b. Business-income and extra-expense coverage

CSI also asks the Court to hold as a matter of law that it is entitled to business-income and extra-expense coverage under the policy.  The policy provides coverage for lost business income and extra expenses (collectively, business-interruption losses) incurred due to a covered loss.  The Court previously determined that CSI's business-interruption losses were limited by the policy's terms to a 12-month period immediately

---

[16] Counsel for General Casualty acknowledged at oral argument that she was "not aware of any" evidence that CSI intended its claim to be handled on an ACV basis.

[17] As discussed previously (Order dated Aug. 31, 2010 (Doc. No. 40)), the 180-day notice requirement is triggered only when the insured chooses to make a claim on an ACV basis and then later opts to also claim additional coverage based on RCV.  Since there is no evidence that was the situation here, the notice requirement is inapplicable.

following the date of the lightning strike.  (See Order dated Aug. 31, 2010 (Doc. No. 40).)  Nothing has occurred to alter this conclusion.  As with replacement-cost benefits, however, the Court cannot determine that CSI is entitled to business-interruption losses for this time period as a matter of law.  It can merely determine that CSI may recover business-interruption losses under the policy, but only if General Casualty's remaining defenses to coverage fail and if CSI can prove such damages.

### c.  Limit of $4,049,500

Finally, the parties have cross-moved for summary judgment on the issue of whether the policy limits CSI's potential recovery for damage to the Peddinghaus to $4,049,500, or whether coverage is unlimited under the policy's terms.

In support of this (approximately) $4 million limit, General Casualty relies upon the Building Personal Property Coverage Form in the policy entitled "**Limits of Insurance**," which limits the amount General Casualty will pay to the "applicable Limit of Insurance shown in the Declarations."  The parties dispute which declaration page is applicable, however.  General Casualty relies upon a declaration page entitled "Commercial Property Coverage Part Declaration," which expressly lists a "business personal property limit of insurance" of $4,049,500.  This limit corresponds to the total reflected on the schedule of values of all of CSI's equipment prepared by Perry Haberer.  In contrast, CSI points to a different declaration page entitled "Commercial Property Coverage Part Declarations:  Systems Breakdown Endorsement Schedule."  That page indicates that CSI has comprehensive coverage, which includes "machinery and electrical equipment," and it states: "Limits of Insurance:  Property Damage — Not Limited."

34

CSI contends that this second declarations page creates a patent ambiguity about whether or not coverage was limited to $4,049,500.  However, it fails to explain why the "Systems Breakdown Endorsement Schedule" is applicable to the type of coverage and type of claim at issue here.  It is undisputed that the cause of loss in this case was lightning and *not* a system breakdown.  In the Court's view, it is not ambiguous for the policy to provide unlimited coverage for a loss covered under its systems breakdown endorsement schedule while limiting coverage to $4,049,500 for other types of covered losses.  Furthermore, CSI's own representation of its equipment's value (on the schedule of values) was the source of this dollar limit on its insurance coverage; the Court will not stretch to find ambiguity in the policy where none exists.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED:**

1.     General Casualty's Motion for Partial Summary Judgment (Doc. Nos. 97, 126) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.     The Motion is **GRANTED** with respect to Counts 2, 3, 4, 5, 6, 8, and 9 in the Second Amended Complaint (Doc. No. 124), and those claims are **DISMISSED WITH PREJUDICE**;

b.     The Motion is **DENIED** with respect to Count 7 of the Second Amended Complaint (Doc. No. 124); and

c.     CSI's potential recovery for damage to the Peddinghaus is limited by the terms of the insurance policy to $4,049,500.

35

2.      CSI's Motion for Summary Judgment (Doc. No. 95) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The Motion is **GRANTED** with respect to General Casualty's affirmative defenses based on (i) failure to give notice of its intent to replace within 180 days (Doc. No. 125, ¶ 131) and (ii) failure to satisfy condition(s) under the policy (Doc. No. 125, ¶¶ 135, 136), and those defenses are **DISMISSED WITH PREJUDICE**;

b.      The Motion is **DENIED** with respect to General Casualty's affirmative defenses based on (i) fraud and (ii) spoliation of evidence;

c.      The Motion is **DENIED** as to Count 1 of the Second Amended Complaint (Doc. No. 124), the breach-of-contract claim;

d.      CSI will be allowed to seek replacement cost value (as opposed to actual cash value) at trial;

e.      CSI will be allowed to seek damages at trial for lost business income and extra expenses under the policy, but its time frame for such damages will be limited to the first 12 months following the date of the lightning strike pursuant to this Court's prior Order (Doc. No. 40); and

f.      Potential damages for the Peddinghaus are limited by the policy, as set forth above in paragraph 1(c).


Dated: August 17, 2011                          s/Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge